All right, your second one, 18-11415, University of Baptist v. Lexington, this one's the claim against Lexington, it's not the pleading case, this is the summary judgment, right? Yes sir, and I think most of what we've discussed at this point would apply equally. So I'll try to just pick up at a point that hopefully makes sense. The only thing that would be different, I think, off the top of my head that's significantly different are the pleading standards that you mentioned and the Messerschmitt cases. What does effectuate mean? And we would request that you just look at the case law on those, look at the plain language of the statute primarily, and make your decision. The rest of the things, I think, are all the same because, again, the allegations mirror the ultimate evidence. There is more detail because now we have, for instance, a roofer confirming what I think a jury would infer, that yes, we will abide with our deals once they're made. We have evidence like that. We also have additional evidence, for instance, that the reason that the adjuster was making these representations about you'll be indemnified for this, that he had told them all the funds would be provided, was because the adjuster actually thought that. The adjuster did not realize that there was a $250,000 limit on this. And the adjuster admits he needed to tell them once he learned of that. But here's the thing. Just as an insured is supposed to read the contract, so is the insurer. So is the adjuster. They should know the facts that they're going to hold the insured to. And if they make representations that mislead them, they have a duty to fix that. So if we get past the initial frame, the initial problem in November and December, when they had, when the evidence indicates they knew full coverage was going to be applied, and they could have simply accepted that and said, here, we'll cover this, go do your work, we'll pay you when it's done, they would have had their benefit of the bargain. But if not, then you get into the misrepresentations. They're alleged in the paragraphs I mentioned, but you also have the evidence all backing that up. It comes from the testimony confirming that you actually have evidence in there of the will indemnify this, a phone call that you said you'd provide the funds, et cetera, those type of things, if you have to go that far. The issues that were, the real issue that Lexington, Lexington, the insurer, raised in response was not any of these things. I think at this point they're basically conceding that by November, December, they knew this claim was fully payable. They understood this claim was fully payable. They're trying to say they didn't have any requirement to do anything for two reasons. First of all, the payment after repairs clause, I don't remember how it's phrased now, but the idea that the contract says, we don't actually pay these until you do the work. Again, this is not a mystery. This is something that the legislature contemplated and accounted for. And an example of that is in a prompt pay statute, 542.056 and .057, where you have the requirements for acceptance or denial in .056 and then payment in .057. And the payment section clearly contemplates that if there's something the insurer has to do first, a contingency before payment, then it lengthens the time for payment. You don't have to pay them until five days after they do it. But there's no such contingency requirement for the acceptance or the denial. The insurer has to make his call as soon as he has the information to do it. I mean, as I interpreted everything, the insurance company never said, we're not going to pay $250,000. And that, I think, is a, frankly, I agree with you. If I was the fact finder, that's how I would decide it, but I'm not. And it's a little, I think, more open-ended to that, both on the allegations and the evidence. The reason, I think, some of these other sections were added about, for instance, 541.060A3 is giving a reason for denial. That would only apply if a jury found that the failure to pay November, December, when they knew it was $285,000, and the shift to time and materials constituted a denial of payment, and they said, we'll pay this, we won't pay that. If it could be interpreted that way, then A3 would apply. If not, I think you're right. I think it's really a situation where it's a straightforward violation, the Prompt Pay Act, that they did not accept or deny. And so, if that's the case, without regard to any of the other stuff we've discussed, it's got to go back to the trial court for a prompt pay violation, because they didn't comply with the 45 days after everything they asked for, 15 days after everything they asked for. So, at the very least, the church should be entitled to interest on its $250,000 that it received. And I'm sorry I got off track on that, but with regard to this, the problem is not payment. The problem is not accepting or denying the claim for full payment back in November, back in December, that then resulted in extra cost. Which leads us to the second main issue by Lexington, which is the Menchaca issues. They keep characterizing the church's claims as claims for policy benefits. But as you and I agree, this isn't a claim for policy benefits. This is a claim for the additional cost created by the adjusting process itself. And as we said in the briefs, you can look at it two different ways. It's recoverable under Menchaca by virtue of either the benefits loss rule or the independent injury rule. Which way it would fall probably depends on the way the jury comes down on the factual issues. But either way, this is a situation where the church's costs have increased. Are you saying this was a negligent claims adjustment? I don't think it was negligent. At the very least, it's reckless. I think it's in, I think there's evidence where a jury could find it's intentional and that it was knowing that they knowingly violated this and could add trouble damages. But at the very least, we've got recklessness. But two, my recollection, if I remember, I think for the particular statute that I'm thinking of, I think the standard, there's the phrase from one of the cases that there's no claim for negligence claim adjusting. But if I remember out in the context of 541.060A2, the standards adopted by the court are that the insurer knew or reasonably should have known the claim was covered. So at least in that narrow context, negligence is enough, I think. And if I misled the court on that, boy, I sure apologize. But I think you've at least got recklessness on the part of the adjuster here. I think the facts are at least go that far and maybe all the way to intent. Ultimately, though, that is the real issue before the court is that's for a jury to decide, not for me. What is the precise jury issue? There are layers of jury issues, I said before. The most obvious one being the failure to effectuate. Did he fail to effectuate a settlement, and then did the failure to effectuate cause damages separate from the policy limits? For the reasons we've discussed before, I think the answer is yes. And if so, then the damages are the extra $600,000. The shift from $35,000 out of pocket to almost $600,000 out of pocket. When you say fail to effectuate the settlement, you're talking about the adjuster or you're talking about Lexington? Lexington has all of the duties. The adjuster may have only had a duty to effectuate within the scope of whatever it was he was doing, investigating the claim, coordinating with, etc. Whatever the adjuster was doing, Lexington has a duty on everything. The insurer unquestionably, everybody agrees that Lexington is going to have a duty for everything found in Chapter 541, regardless of the Messerschmitt issues. I mean, just suppose they had held the feet to the fire of the roofer and required him to do this entire job for $285,000. And he used asbestos roofing shingles rather than the tile, for instance, in order to cut costs. And then the roof leaked. Then we'd be here in court because the adjusting was not done properly, right? Because they didn't really fix the roof. Oh, certainly not. I think we would be, Lexington at that point would have met its obligations because its only obligation was to... Even if the result of its duty to remediate the loss resulted in another leaky roof. If its duty to remediate the loss was to pay $250,000 when it knew that was covered. And so whatever happened after that would have been somebody else's issue. If somebody was here talking to you about that case, it certainly wouldn't be me. I would be afraid of being sanctioned for that. I'm just trying to understand the allegation. Did Lexington have a duty to sign the contract with the roofer on behalf of the church? Lexington's duty was to pay $250,000 when it realized the claim was covered. When did it pay the $250? I'm not sure, but I know the cost were... Last references I remember from the record is July. There were some of the comments about the inflated cost were July 2017. So let's say six months after... Six, seven months, eight months? Eight months after I think it knew the claim was covered. In fact, I mean, were there other damages to the church? Because Lexington's brief says that they paid out a total of $800,000 or $1,000,000, $800,000. Yes, definitely. And that's why, thank you for doing that, that's actually on my notes, is to clarify the distinction between the two claims. This goes to your tile question to him earlier. Tile's completely different. What, as I understand it, is that this is a hail, wind, whatever, weather-related claim, need to replace the roof. When they start figuring out what's needed to fix the roof, they find out, okay, the underlying roof stuff, I think is probably the technical term, whatever roof problems are, this is old, it needs to be brought up to code. So in addition to fixing the stuff that got broke, we also have to do underlying things to fix this. So the issues of all the things that I've discussed to this point, all the extra-contractual stuff, everything involving extra-contractual relates to the code upgrades. Then there is a distinct and separate, littler, simpler issue on breach contract, which involves the tile. That's, I think I covered it in two pages. It's basically a straightforward, who gets to decide this issue between two experts. Both experts agree. Factual background, if I remember rightly, they asked for a bid. The first bid comes in that the church's roofer says, I'll replace the, I can't get exactly the same kind of tile. Here's what we can do, though. We can use some of the existing tiles, and then get you some of these and we'll replace it with the same kind of stuff. It'll be some old and some new. Partially old, partially new roof, but with really great tiles. Loosely what I think the affidavits say. Okay. Basically, the adjuster, supposedly on behalf of Lexington, says, give us another bid for a different kind of tile. And they end up paying for a lower-quality tile that's all new. Okay. So then the issue in that is, did they get a roof that was of like, kind, and quality? No question that it wasn't like, kind, and quality. Both experts agree on that. But Lexington's expert says, it doesn't matter, though, because this new, low-quality roof is better. Qualitative, that's the issue. The word is better. It's basically, is there any damages? Because their expert says, this roof we ended up paying for is better than the like, kind you should have gotten. Because it's entirely new. Because it's entirely new. Well, the question of whether a partially old, partially new, high-quality is better or worse, sorry, better or worse than a new, lower-quality is plainly a qualitative issue for the jury to decide. It is the fact issue. The jury's not bound by either party's expert. That's frankly the Ips Dixit of a credentialed witness, which this court has rejected time and again. That's the issue. It's a fact issue. Do both expert affidavits say why the Varia tile, I think it's the Varia, is a lower quality or lower price than the Ludovica? I honestly don't remember. Both affidavits are very short. And I think, frankly, if I remember rightly, I don't believe their expert report even, the expert report even opined on the issue of it being quality. And so, but both experts report, neither expert's testimony was sustained, any objections, et cetera. So, they're both in the record. It's a fact issue. Your point, in a nutshell, that because Lexican refused to take the bid and said, we would rather proceed on a time and materials basis, that that was an intentional, fraudulent, whatever act? It's at least reckless. I think, I think they, we're getting into. That's a failure to effectuate a settlement with whom, though, a settlement with whom? UBC. The first thing, I think it was a knowing and intentional failure to not pay the policy limit. Because they always told the church we'd pay $250. They always told the church we'd pay $250. No, no. They never say we wouldn't pay $250. They never said anything about $250. The adjuster never said he would pay $250, never offered to pay anything because he never even knew there was a limit. What he said constantly is the process requires us to agree on a scope. The church went through that process, which is not the. But your client had the contract which said $250,000 for the code upgrade. I mean, so you're on, I mean, they're on notice of that. Even, even the stupidest homeowner is on notice of the policy provisions. And I think the insurer is as well. And I think the stupidest adjuster should be as well. But, in fact, they weren't. Certainly. But this is the case against the adjuster. This is summary judgment against the insurance company. Certainly. At which, and the policy binds you, so. Certainly the insurer did know what this policy said. But again, our claims aren't about payment of the $250. Our claim is November and December. Did you know it was covered? If you knew it was covered and you didn't pay, it's intentional, okay? If you knew it, if you were reckless in not paying, then you were reckless. On your breach of, hold it for your run, on your breach of contract claim, this replacement versus repair bid, what were the damages that were asserted? I understand the argument about replacing something inferior versus repairing something, which you say was superior, but what was the asserted damage suffered? I think the damage would be the difference in the value of the Lutowichy combo, old new Lutowichy versus the new Versa tile, which is just a great name for tile. I think it was $100,000, something like that, the difference in the two prices. I just asked you about it. I'm just saying, was that articulated by UBC's expert or in dispute of? I'm trying to get to the factual. I believe it was UBC's expert. I think it would appear in his expert affidavit. I'm thinking maybe around 890 something in the record, 896 or so, where he compared the two bids. I think the first one was 600 and change, and the second one was 500 and change. I think that would be the difference in damages, much lower than the other issue, I think. Okay. All right. Well, you have your rebuttal time. Thank you. Mr. Wallingford. Okay. All right. May it please the court? My name is Brett Wallingford, and I represent Lexington Insurance Company in this matter, brought by the University Baptist Church. Some of the issues that relate to this claim started with the original case that you guys heard today, which is this is unfortunate. The court, not we guys. I'm sorry? The court, not we guys. Okay. I'm sorry. I apologize. My mistake, Your Honor. The issue related to church, it is unfortunate for the church here. One of the issues that Justice Jones brought up was the fact that what you see a lot of times would be a change order in this case, and that's what we believe would have happened in this case had there been an acceptance. But we've got to back up for a second and sort of take this in really the order that it should be taken. There's really two issues that are before the court today. One is the breach of contract claim, and that is what is like, kind, and quality. The other one is the extra contractual claims, and all of the extra contractual claims arise out of the unfortunate, gross underestimate by UBC's chosen roofer of what it's going to cost to do the code upgrades. Here, UBC is attempting to take advantage of that gross underestimate by their chosen roofer and try and get their insurance company to pay for those damages. Lexington didn't create the code upgrade issue. That was something that was identified by UBC's roofer. It was then an engineer hired by UBC who came up with the fix in order to allow the new roof to be put on. That was all done by people that were hired by UBC. There's no dispute here that Lexington has paid its entire $250,000 sublimit. As the court has recognized, that's clear in the policy. They don't have to be told what it is. They are on notice of their limits in their policy, and regardless of whether they, Church, was ever told what those limits were, they are still held to those limits. Why did they pay so late? Is there a reason they didn't pay until July? Well, so here I think Mr. Taylor is trying to confuse the issues. Code upgrade coverage is paid on an as incurred basis. So what happens for code upgrade coverage, the Church actually has to spend the money. They then have to show the insurance company, here we've now spent the money, please reimburse us. There is nothing in the record that says that that $250,000 was not paid timely once they were provided with the information from the Church. You're talking about the policy requires that. Yes, Your Honor. And that's clear language in the policy of when code upgrades have to be paid. So in answer to your question, Your Honor, it was paid timely, and there in fact is, other than what I heard from Mr. Taylor today, there are no allegations or evidence that it was not in fact paid once the information was provided to Lexington of what amount, that that amount had actually been paid for code upgrades. To answer your question, Your Honor. Was the entire $250,000 for code upgrades, or was it part just damage? The entire $250,000 was for code upgrades. There was other payments made for the roof itself, for other portions of the roof, and the actual cost to put on the roof that would not be considered a code upgrade. But the $250,000 itself is all code upgrade, and that was what was paid. I'm going to take this in reverse order from the way that Mr. Taylor did, because usually you start with a breach of contract claim, and then you go into the insurance code claims. A couple issues that I think Mr. Taylor is mistaken on is, one, the experts don't agree that Ludwicky Tile and Vareya Tile is, that there's a difference between the two. But that doesn't have to be decided by the court. What Brett Lockridge, our expert, testified to was that the like, kind, and quality repair here would have been to repair the damaged tile, not replace the whole roof, okay? And under the policy, Lexington gets to choose the lesser of repair or replacement. That is a, another, that's part of the loss provision in the policy that Lexington gets to make that decision. So the undisputed testimony, and this is what Judge McBride relied on, was from Brett Lockridge that said the actual like, kind, and quality replacement would have been just to repair the roof. The expert designated by UBC, he does not dispute that. He does not actually say anything about it. All that he says is there's a difference between Ludwicky and Vareya, but you don't get there because that's not the issue. That's not the like, kind, and quality repair. Now, they could have put forth an expert report. They could have put forth a rebuttal report. They could have put it in their expert's affidavit that, no, I disagree with Mr. Lockridge. That's not the correct like, kind, and quality repair. They didn't do that. There is no contradicting evidence from UBC on that issue. And that's why summary judgment was proper. That's what Judge McBride relied on. And that's why the breach contract claim should be upheld. There's no factual dispute. The contract and Lexington's leverage to make the decision makes the breach contract claim as a matter of law. There's no fact disputes. That's correct, Your Honor. I thought he was saying there was a dispute over the damages and so forth. Maybe I misunderstood. I don't think you misunderstood him. I just think what he argued to the court is incorrect, Your Honor, and is not what the evidence shows. I certainly did not see it anywhere in their expert's affidavit disputing what Mr. Lockridge said about what the true like, kind, and quality repairs. What he says is, he only looks to the Vareya and Ludowicki tile and the difference there. But we don't get to that issue. On that breach contract claim, it's undisputed that UBC actually received a better than like, kind, and quality repair based on what Mr. Lockridge testified to. I thought your whole point wasn't a repair. It was a replacement. So we don't look at whether it was a like, kind, and quality. Am I missing something? I think that the like, kind, and quality is a repair in this instance, not the full replacement of the roof. And Lexington policy gets to make that decision. I thought they made the decision to replace, not repair. They actually, so the testimony is that the actual like, kind, and quality repair would be to just repair the tile. What ended up happening was Lexington agreed, rather than in trying to get an agreement with the church, decided, OK, even though the like, kind, and quality repair, which is the undisputed testimony, would be just to repair it. We will go ahead and allow you to replace and pay for the replacement of using Vareya tile instead of Ludovicky tile. In other words, you're saying that they could have, if they had repaired it, they would have been, they would have had to scrounge around and find the Ludovick tile. But replacing it with Vareya was an option that they had totally apart from that. It's something they did to try and resolve the issue at the church. But the point being that the insurance policy gave them that option. It gave them the option that they could have just done the repair. Right. But they chose to replace, is my point. They did not choose to replace, Judge. What they ended up doing was a compromise with their policy. Did they repair or did they replace?  I thought the whole point was they replaced the roof. They ended up allowing for the replacement of the roof. But either they replaced the roof or they didn't. Did they replace the roof? They paid for the replacement of the roof, Judge. But the undisputed testimony is that the like, kind, and quality repair, which is all that they're obligated to do under the policy, would just have been to repair. They replaced the roof, but they replaced it with something different than that which they would have repaired. Because it was two different kinds of roof. They had either the option to repair or replace, and they chose replace. Is that right or not? They actually did not. The original choice was that they were just going to repair the roof. But what did they actually do? They ended up paying the insurance that they could put on a new roof. Did they have the right to do that under the policy or not, to replace? Did who have the right? I'm sorry, Judge. Did Lexington have the right to decide whether it was going to pay for the replacement or pay for repairs? They did, Your Honor. And they decided ultimately to pay for replacement? As a compromise to their insurance. Well, why does it matter if it's a compromise or not? Why do you keep hedging? No, because it wasn't required under the policy for them to replace. They made an election under the policy, which they had the right to do. I thought that was your whole point. They had the right. Yes, they had the right. Their election was to repair. But then, as a compromise to their insurance, they allowed their insurance to go ahead and replace. Are you standing on the right under the policy to replace, or to repair instead of replace, or not? That's just a straightforward question. They had the right. Are you standing, are you saying as a matter of law, they had the right to replace and that's what they did, end of discussion? I'm not sure I'd, ultimately they did pay for the replacement. That is correct, Your Honor. We've all heard you say something about four times. And the effort is to cement that. And you seem to be going further toward the back door on it. So it's not a trick question. I appreciate it. Repair or replace. You were arguing that you're entitled to some judgment as a matter of law because the contract, the policy, gave them the option of what to do, as opposed to this being a fact issue that a jury gets to decide. And that's what we understood you to say. Correct. So it's either repair or replace. And Judge Ordon is asking, you were asking, are you standing on that the roof was replaced, but it was replaced with a different quality of material than the repair would have been? And so they chose the repair option, which they were allowed to do in the policy, but then as a compromise, paid their insured so that they could replace the roof. They were still under the policy saying that they were electing the repair, but as a compromise, gave the insured a better than like kind and quality repair. The analogy is if a car is stolen and a bunch of parts in the car are trashed and the insurance, normally the insured says, I want a new car. But the insurer will say, no, no, we'll pay for repairs and make it as good as new when everybody knows it's never as good as new when they repair it. But the insurance company, quote, replaces it with, let's say, exactly the same car but one year earlier model, right? Yes, Your Honor. Similar. I mean, most insureds would be happy with a complete replacement. Yes, Your Honor. But you earlier said, having done that, UBC's expert did not dispute your expert's the whole damage piece. Isn't that what you said? In other words, there was no factual dispute remaining about damages or whatever. What I said, Judge, was that the expert for UBC did not dispute that the like kind and quality repair in this case would have been the repair. They don't dispute that at all. There was no evidence provided on that. Okay. I asked Counsel Oppsit when he was leaving, you know, what was the difference? You know, was there a dispute on damages? And then he said, well, their expert had this number, ours has this. The difference was that. So I was trying to hone in whether there was a fact dispute over dollars and cents. And that's what I'm trying to just be clear. I hear you saying his expert didn't dispute what the policy says about repair and replace, right? Correct, Your Honor. Okay. That's your point. All right. That was my point, Your Honor. Okay. Apologize if I was confusing on that. Getting on to the extracontractual claims. All of these claims asserted by UBC arise out of this alleged issue of them not being able to accept the proposal from Eubanks Roofing for the coat upgrades. One of the things that we have to look at in this, the proposal that they are talking about is at the record of 922, and it was Exhibit 6 to Kathy Rain's deposition, who was the person at UBC who was dealing with Eubank and was really dealing with this claim. One of the things that's been glossed over, when I deposed Ms. Raines, and her deposition here, testimony is at the record at 804. When asking her about this proposal, I had first asked her about the original contract with Jeff Eubank Roofing. There was an original contract that was signed by Jeff Eubank Roofing and was also signed by UBC. In that original contract, it was left open that there's going to be additional coat upgrade issues that have to be decided. Exhibit 6, which is the proposal that's being referenced by counsel throughout, I asked her about that, and she indicated that she didn't see an opportunity to sign this, whereas the other proposal had a place to sign, this one does not. And this is referring to the original contract that she signed before this proposal and this actual proposal. And so I asked her, so there may not, this may have just been an estimate then from Jeff Eubank Roofing. Her answer, perhaps. So they may not have actually been agreeing to do all the work for this price. And her response was, I believe, we'll have to check the timeline to be sure, but I believe this predates receiving all the details of the report from the engineer. So I believe this proposal was also simply an estimate, like you said, without having all full knowledge of what needed to be done. Okay. And if that's true, then you and the church would understand that the cost could have gone up. We understood the cost could change. We were still waiting. That was her testimony in response to this proposal for the $285,000 that Council for UBC keeps attempting to refer to as a fixed bid. There really isn't any evidence from UBC's side that this was a fixed bid, at least at the time that this proposal was provided. In getting to the allegations. Was there ever a fixed bid? You sure hedged that. Was there ever a fixed bid? I have not seen anything other than Exhibit 6 that I referenced, Your Honor. And I believe that it's Exhibit 6 at the record 922 that Mr. Taylor was referring to whenever referencing this fixed bid. Now, the rest of these claims under the Texas Insurance Code, there's just simply no evidence of misrepresentations or any other actions by Lexington that would amount to a violation of any of the insurance code's provisions that have been pointed out by UBC. They've made allegations under 541.060A1. Now, one of the issues with that is there were actually no allegations ever made against Lexington in the amended complaint under that section. The first time that it was raised was in response to the summary judgment motion that we filed. Judge McBride rightly held that, well, they didn't raise it in their amended complaint, so we're not even going to consider those. We've covered this a little bit, but a lot of what UBC's counsel is trying to rely on for the alleged violations of the insurance code is that a payment should have been made back in the time frame of this proposal  that we're talking about code upgrade coverage, that payment is not due until the money is actually incurred. And as all of you pointed out earlier, at no time did Lexington say they would not pay the $250,000 in code upgrade coverage. That was never an issue. Looks like I'm out of time unless there's any other. I have one quick question. Yes, Your Honor. When did repairs actually start on the code upgrade? They started in . . . Relatedly, when was the $250,000 mark hit? So two things have to happen, Your Honor. They have to incur them and they have to actually pay them. So my understanding is that the $250,000 payment was made once that information was provided to Lexington. There's no evidence that Lexington did not pay that $250,000 timely once the information was correctly submitted to them. There was also a question about when Mr. Taylor was talking about the fact that the roofing company started before they were even cleared by Mr. Foreman. That is actually in the affidavit of Kathy Raines. Her affidavit is 926 to 928, and paragraph 13 says, before JER, that's the roofing company, was cleared by Foreman to start the redecking on a time and materials basis, JER had already torn off a substantial portion of the roof. So the roofing company was going on regardless of any discussions that they had with the insurance company or Mr. Foreman. All right. Thank you, Mr. Wallingford. Do we have your argument? Mr. Taylor? Try to be brief and get out of here. To one of his last points, the issue is not that they didn't pay in November, December. Even back in September, the issue is they did not accept or reject in November or December. We agree that in this situation, at least, they could have accepted contingent on completion of the repairs with payments coming five days afterwards per the prompt pay statute. The issue is not effectuating by accepting or rejecting when it was reasonably clear the amount was going to exceed the policy limits, and that's what led to all the other damages. In fact, I don't think there's any dispute about it now. Let's divorce the two issues of liability versus damages and deal with them separately. Nowhere in their response brief or in this oral argument did I hear any contention against the idea that Lexington knew in November and December that it was reason or, forget, sorry, don't use the word no, which is the statutory language, reasonably clear that this was covered in November or December. That's the language of A2. I don't think it's even been disputed in their briefs. So we've got liability. I think it's practically, might be entitled to a summary judgment on liability, but at least it's a fact issue for the jury. I don't ever seem to say indicating that it was ever in doubt that it was covered. That's my problem. They proceeded as if it was covered. No, they didn't, because the requirement, in fact, I think everybody agrees they never, the language in this hearing is everybody saying they never accepted or denied coverage until way down the road in July. They never accepted coverage by agreeing to pay. They never said we'll pay this claim. They knew on November, December, this was a fully covered claim. The proper way of handling it under the code would be to say this claim is accepted and we will pay it once the upgrade is completed. On the other hand, the misrepresentation was that the adjuster said you're indemnified up to X. That's only if you disagree with that. Why is it ever agreement to pay? That's because it was as pled and as briefed on summary judgment originally, made all the claims out of abundance of caution, not knowing how the jury would resolve it. Those are all, as I said, misrepresentation are all the second layer claims if you don't have a violation of a failure to effectuate back in November, December. If you've got a failure to effectuate in November and December, you've got straightforward liability. The question then is, is this damage is covered by Menchaca? If we've got a violation. The only fact you seem to have alleged that was the adjuster said you were indemnified back in November, December, I thought you said that's the misrepresentation. That's the misrepresentation. I'm not referring to misrepresentation. I'm referring to. I'm just saying you're not denying that that statement was made. You're affirmatively saying it was made. Where's any statement that they said let's just see about coverage. We don't know yet. I mean, everything you've said is they accepted coverage. They accepted indemnity. There's no need for allegation or evidence of that. What they have to do is accept it. They have to accept coverage that they claim when they know it's covered. Where did they fail to do that? They failed to do that in November and December when it was, by not agreeing to pay the full policy limits payable when they're incurred. They had at that point. Let's wait and see. They said wait and see in 1st September, October, November, and December. Let's agree on an agreed scope to determine the cost. Let's kick this can down the road. Let's agree on this cost. And then finally, ultimately in January, says no, we're not going to pay on this bid. We're not going to pay on this claim. We're going to go to a time and materials cost and see what it is as it goes along. That's not a reasonable way of effectuating settlement. That's not within the requirements of the Prompt Pay Act or the requirements of any of the other statutes. That's the first violation right there. Only if a jury disagreed with that somehow would you then get down the road into whether they misled the church into not objecting to this time and materials. Where is the, give me a citation to the Prompt Payment Statute. A citation to the Prompt Payment Statute is, it's a number of sections in Chapter 542, begins at, I think, .055. The ones that are relevant, I think, are .056, which governs the time period for accepting or rejecting after you have all information needed to make the call. And then .057 is the one that refers to the time of actual payment. It's the one that includes a provision, a carve out for situations where the insured has to do something before it actually gets the check. But you're talking about failure to effectuate, not Prompt Pay. He's been talking about Prompt Pay. Yes, the Prompt Pay was to distinguish with his comment where he keeps saying, we're saying they should have paid in November or December. I'm saying they should have approved payment. What statute are you talking about there? That would be number one, failure to effectuate settlement when it's reasonably clear. Okay. Which statute? 542.060A2. Okay. Then we would also have on that one, if, which they now have not argued. It was pled, it was argued below. I don't think they're challenging it now. But if they were to continue arguing that they didn't have enough information in November or December, that would also implicate section 542, section 540, I hope I didn't give you the wrong statute. The first one was 541.060A2, failure to effectuate. It would also implicate 541.060A7. Even, this is where even if they didn't have enough information to know it was covered, they would have if they had conducted an investigation and just got a second bid. They were already over the 250 limit. They were already over at that point. So the proper thing would have said, yes, we'll pay up to the 250 policy limit. I'll deny that additional 35,000 and anything else that's incurred, given admission and denial, give the reason for denial under A3, that we're not paying that extra 35,000 because your policy limit's 250. And hey, we'll cut you a check whenever you finish the repairs. That's the reasonable approach in November and December. Approve, deny, explain the partial denial, and say we'll pay you down the road. Had they done that, the damage in this case would not occur. And if I have. Then you would have sued them for giving you a leaky roof. I certainly wouldn't have. I don't think anybody could have done that under Rule 11 without being sanctioned. They might have sued the roofer. All right, Mr. Staley, you've given us a lot in two cases. Thank you very much. I appreciate it. You're welcome. Thank you, Mr. Wallingford. Do you want to take that or do you want to press against it? I don't care.